Argued November 3, 1972, affirmed February 1, petition for rehearing denied March 21, 1973

HAROLD BUTLER ENTERPRISES #97, INC., *Respondent, v.* VANLANDINGHAM, *Appellant.*

505 P2d 1149

*Roger Tilbury* and *Henry Kane,* Portland, argued the cause for appellant. With them on the briefs were Tilbury & Kane, Portland.

*R. Alan Wight,* Portland, argued the cause for respondent. With him on the brief were Norman J. Wiener, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

HOWELL, J.

Plaintiff filed this action alleging an unlawful detainer of real property in its first cause of action and alleging unpaid rentals and management fees in its second cause of action. Both actions arise out of a restaurant franchise agreement between the parties. The case was tried before the court without a jury, and a judgment for restitution of the premises and for recovery of management fees was entered in favor of plaintiff. Defendant appeals.

Plaintiff, an Oregon corporation, is a wholly owned subsidiary of Denny's Restaurants, Inc. Denny's Restaurants is engaged in franchising individual restaurants to persons and also operates some restaurants of its own under the trade name of "Denny's." In 1965 defendant secured a Denny's franchise for the operation of a Denny's Restaurant in Portland. The franchise agreement which was executed between plaintiff as the franchisor and defendant as the franchisee required defendant to pay $50,000 for the franchise, plus certain weekly amounts for rental of the equipment and fixtures, for rent of the premises, and for sign rental.

The franchise agreement also recited that Denny's Restaurants had developed, advertised, and promoted

certain styles and techniques of restaurant operation; that defendant, as the franchisee, should sell only such products as are prepared by plaintiff in accordance with Denny's policies; and that all items would be purchased by the franchisee from plaintiff or from any manufacturer authorized by plaintiff. The items were to be purchased by the franchisee at standard prices to be fixed by plaintiff.

The franchise agreement stated:

"* * * * *.

"5. f) There is attached hereto, marked Schedule 'A' and made a part hereof, a list of the principal goods, products, merchandise, supplies and commodities now being manufactured or sold by the First Party which the Second Party may need for use or sale at or from the place of business described above, and the Second Party agrees to pay therefor at prices to be fixed by the First Party from time to time for all ___Denny's Restaurant___ franchise operators in full, upon invoice. Such list may at any time be added to or subtracted from by the First Party. Only such merchandise, products, goods or commodities shall be sold or offered for sale by the Second Party, at or from the premises described above as are set forth in or shall become a part of the list set forth in Schedule 'A':"

Paragraph 7 of the agreement required the defendant franchisee to pay plaintiff 12 per cent on all items purchased:

"7. In consideration of First Party's Authorization to Second Party to use the trade name and the insignia, trade marks and designs and in consideration of First Party's imparting to Second Party all of its selling, promotion and merchandising methods and techniques, and in consideration of First Party's furnishing adequate and competent supervisory personnel to insure that all various

retail outlets are operated in accordance with First Party's uniform standard of quality, cleanliness and service, Second Party agrees to pay to First Party a service charge of Twelve (12%) percent on all items purchased by Second Party from First Party or First Party's designees. All discounts given First Party from its suppliers for quantity purchases shall remain the property of First Party."

The entire dispute in this case is focused on the 12 per cent management fee, or service charge as it was sometimes described by the parties. The defendant paid the management fee on all purchases from plaintiff or plaintiff's designees until July 1970. Apparently at that time he concluded that the obligation to pay the management fee violated the Sherman Anti-Trust Act. Subsequently, the defendant refused to pay the management fee on any purchases.

Plaintiff filed this f.e.d. action for restitution of the premises and for recovery of the management fees on November 9, 1971. Defendant filed a plea in abatement asking that the instant case be abated on the grounds that he had filed an antitrust action in the United States District Court for the District of Oregon against Denny's Restaurants, Inc., and Harold Butler Enterprises #97, Inc., the plaintiff herein. In the plea in abatement defendant alleged that the question of whether defendant was liable to plaintiff for payment of the management fees was one of the issues in the action in the federal court.

The trial court denied the plea in abatement, and the action was tried on the merits in the circuit court. However, after completion of the trial, the court entered an opinion in which it stated that the pivotal issue was the validity of the management fee and,

therefore, the court would withhold the entry of a decision and judgment until that issue had been decided in the antitrust action in the federal court.

In March 1972 the defendant's action in the federal court was dismissed and no injunctive relief granted. Thereafter, the trial court in the f.e.d. action entered findings as follows:

"* * * (1) a franchise agreement and lease existed between plaintiff and defendant, under which defendant operated a restaurant as a Denny's franchisee, (2) said franchise agreement and lease was valid, (3) under the terms of said franchise agreement and lease defendant had the obligation to pay management fees but failed to do so, despite proper demand and notice, (4) such failure and refusal to pay management fees constituted a material breach of the agreement and lease, and (5) defendant's possession of the premises constituted a holding contrary to the conditions and covenants thereof; * * *."

The trial court found that defendant was not delinquent in any respect under the terms of the franchise agreement except for failure to pay the management fees. The judgment entered by the court granted restitution of the premises to plaintiff and awarded plaintiff $15,032 as unpaid management fees due under the franchise agreement. The amount of the management fees is not contested by defendant.

The defendant contends that he is not obligated to pay the management fee for several reasons: (1) that the franchise agreement required the defendant to pay the management fee on purchases made from *plaintiff* or *plaintiff's designated purveyors,* but that Denny's, not plaintiff, was the one who designated the purveyors; (2) the "Schedule A" mentioned in the

franchise agreement which listed the designated purveyors from whom defendant was to purchase his restaurant goods was not introduced into evidence; and (3) the management fee is illegal as a violation of the Sherman Anti-Trust Act, 15 USC § 1, and is a violation of the common law prohibition against restraint of trade.

■ The defendant's first two arguments are without merit. From 1965 until July 1970, the defendant paid the management fee as required by the franchise agreement. Defendant sent to plaintiff a complete list of his purchases; plaintiff computed the 12 per cent fee and defendant paid the fee to plaintiff. It is true that the franchise agreement requires the defendant to pay the 12 per cent fee "on all items purchased by Second Party [defendant] from First Party [plaintiff] or First Party's designees." However, the same paragraph of the franchise agreement relating to the management fee states that the fee is in consideration of defendant's use of a trade name and the benefit to defendant of merchandising techniques and methods. The trade name and merchandising methods are those of Denny's Restaurants. The franchise agreement is replete with recitations of the background and importance of the "promotion, sale and merchandising" of products sold under the name of Denny's Restaurants, plus the requirement that defendant sell only such products "that are made or prepared in accordance" with standards established by Denny's Restaurants. After having paid the percentage fee for almost five years on purchases from Denny's, or Denny's designees, defendant is in no position at this time to contend that he is not obligated to pay the fee because Denny's, not plaintiff, designated the persons from whom defendant was required to make his purchases.

■ Neither are we impressed with defendant's argument that he does not owe management fees because a 1970 schedule of designated purveyors was not introduced into evidence. The defendant conceded that in July 1970 and thereafter he made purchases from persons not on the schedule and that he was refusing to pay the percentage fee based on purchases from those listed on the schedule. He testified:

> "* * * I have went out and contacted these people and I am doing business with them as an independent operator.
>
> "I have gotten price schedules from these people and I am not sending money to you to pay my bills. I am not making out the transmittals. We have documents showing prices and we are doing business with these people direct."

In view of the fact that defendant admits that $15,032 is the proper computation of the management fees from July 1970 to the time of the judgment, we cannot see how a failure to introduce a schedule of designated purveyors could have been detrimental to defendant.

Apparently the defendant contends that the decision in the federal case held that the 12 per cent management fee on purchases made from plaintiff or plaintiff's designees violated the federal antitrust laws, and that if it did not the defendant is still entitled to raise the defense of illegality in the state court. The plaintiff, on the other hand, contends the parties stipulated that the decision of the federal court would be dispositive of the issues in this case. According to plaintiff, since the federal court dismissed the defendant's case, refused to award damages or injunctive relief, and defendant did not appeal, the defendant is

precluded from raising the question of violation of federal antitrust laws in the instant case. No such stipulation appears in the record and therefore we cannot consider it.

While we do not have the federal court file before us, it is clear that the defendant herein was seeking damages and injunctive relief in the federal court on the grounds that the franchise agreement or portions thereof violated the federal antitrust laws. At the conclusion of plaintiff's case, an extended colloquy occurred between Judge Goodwin, who presided in the case, and counsel for the parties herein:

"MR. WIENER: I gather from what the Court has said despite comments sometimes labeled as dicta, what the Court has really decided, there has been a failure of proof in this case by the plaintiff.

"THE COURT: Failure of proof by any causal connection between the paragraph three of the franchise agreement, which I am assuming, without deciding, may technically violate Sherman I in subtle respects. Assuming that it does, there is a failure of proof of any causal connection between that and any identifiable financial loss.

"\* \* \* \* \*

"MR. KANE: Well, the injunctive relief that we think is still open is whether the defendants can enforce the Schedule A provisions of the franchise agreement, whether they can enforce the 12 per cent on purchase provisions of the franchise agreement.

"THE COURT: Well, you can try that in State Court. The 12 per cent part of your contract is not a Sherman Act question; it might be a diversity question, but—."

Again the following occurred:

"MR. KANE: Well, Your Honor, we would ask that any findings of fact or law you make a ruling

or constitute a ruling on the 12 per cent service or service charge or management fee.

"THE COURT: Well, I will rule, as far as this Court is concerned, the contract in its entirety is a valid contract to the extent that it does not violate the Sherman Act, and the 12 per cent management fee has nothing to do with the Sherman Act.

"So I am expressing no opinion about it, except that the contract is, on its face, what it appears to be. And it's up to other litigation, if the parties have a dispute about what the contract means, apart from the anti-trust implications."

The court also stated:

"I ask counsel in preparing findings in support of Rule 41(b) dismissal that you stay away from anything that would pre-judge any issues that are still alive in the State Court. I don't want to have any findings in this Court that are unnecessary to this decision, that might have a res judicata effect on some issue that is also being tried elsewhere. * * *"

Judge Goodwin's memorandum opinion, which constituted findings of fact and conclusions of law, was concerned solely with the failure of proof of damages. His findings state:

"Because I find no causal connection between the alleged violations of the Sherman Act (and other relevant sections of Title 15) and the plaintiff's alleged business reverses, it is immaterial whether I characterize the defendant's conduct as unlawful. * * * Accordingly the case must be dismissed for failure to prove injury."

We conclude that the only issue determined in the federal court was that the defendant herein was not entitled to injunctive relief or damages because of a failure of proof.

■ In addition to the duty of United States attorneys to institute proceedings to restrain violations of the antitrust laws (15 USC § 25), private parties are also entitled to sue for injunctive relief (15 USC § 26) or damages (15 USC § 15). In addition to the remedies available in the federal courts, a defendant in an action on a contract filed against him in a state court may raise the defense that the contract violates the federal antitrust laws. *E. Bement & Sons v. National Harrow Co.*, 186 US 70, 22 S Ct 747, 46 L Ed 1058 (1901); *Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.*, 64 Misc 2d 894, 315 NYS2d 897, 908 (1970), aff'd 36 AD2d 582, 318 NYS2d 924 (1971).

■ Consequently the defense of illegality was available to defendant in the state court.

The defendant contends that the portion of the franchise agreement requiring him to purchase his restaurant supplies and ingredients from plaintiff or plaintiff's designees at prices to be fixed by plaintiff constitutes a "tying arrangement" and therefore is invalid as a violation of 15 USC § 1.[①]

■ A tying arrangement is defined as an agreement by a party to sell one product but only on the condition that the buyer also purchase a different or "tied" product, or at least agree that he will not purchase that product from any other supplier. *Susser v. Carvel Corp.*, 332 F2d 505 (2nd Cir 1964); *Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.*, supra; 2 Callman, Unfair Competition, Trademarks and Monopolies (3d ed) § 38.2 (b)(1) (1968); J. Thomas Mc-

---

① 15 USC § 1 states:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

Carthy, "Trademark Franchising and Antitrust: The Trouble with Tie-Ins," 58 Cal L Rev 1085 (1970).

In the instant case the tying arrangement would arise when the plaintiff, as franchisor, granted the defendant franchisee the right to assume the Denny's identity, adopt its business methods, prepare and market its food (the tying items) while at the same time requiring defendant to purchase the necessary restaurant ingredient supplies—food items plus dishes, napkins and menus (the tied items)—from plaintiff or plaintiff's designees.

The vice of the arrangement is the curtailing of competition. The buyer or franchisee is prevented from seeking alternative sources of supply for the tied product, and competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement. *Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.*, supra.

■ In order to establish that the tying arrangement is unlawful, the defendant must show: (1) that the scheme in question involves two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased; (2) that the tying product possesses sufficient economic power appreciably to restrain competition in the tied product market; and (3) that a "not insubstantial" amount of commerce is affected by the arrangement. *Siegel v. Chicken Delight, Inc.*, 448 F2d 43 (9th Cir 1971).

Even with such proof, under some circumstances the tying arrangement can be justified on the basis that the franchisor is entitled to maintain control over the quality of the goods sold by the franchisee.[2]

---

[2] "In conclusion, it should be noted that the franchisee in the

In the instant case the record does not show that the defendant was required to pay higher prices for his purchases from plaintiff or plaintiff's designees than he would have paid for comparable products sold by competing suppliers (*Siegel v. Chicken Delight,* supra). Neither does the record show whether the purchasing restriction was a valid attempt to exercise quality control over the food products or was an attempt to hide markups or kickbacks for the benefit of plaintiff (see 58 Cal L Rev at 1116). Nor does the record show whether plaintiff or Denny's possessed sufficient economic power to restrain competition and whether the amount of commerce affected by the arrangement was substantial (*Siegel v. Chicken Delight,* supra).

Moreover, the record is not clear as to whether the defendant was, in actual practice, restricted in his purchases to those from plaintiff or plaintiff's designees or whether he could purchase some items from suppliers of his own choice.

---

pure franchise situation is relying on the franchisor's experience and superior knowledge to make his franchise a success. The franchisor's success is also dependent upon the success of his franchisees. But unsuccessful franchisees are also more likely to try to skimp on quality in order to minimize their losses. This would be quite detrimental to the franchisor's overall public appeal. Quality and uniformity are cornerstones of the franchise system. But there is a big difference between tying for profit only and tying for quality control purposes. Accordingly, the courts should take a more liberal view towards tying arrangements in the pure franchise area where the franchisor is trying to protect the quality of his product. The new entrant exception should be applied, or expanded if need be, to cover the opening of each new store in a pure franchise situation. The future of these newly opened stores is indefinite and the franchisor does have a real interest: the success of his own operations." Michael Garlick, "Pure Franchising, Control and the Antitrust Laws: *Friends or Foes?*", 48 J Urb L 835, 861 (1971).

■ The record in the instant case clearly fails to establish that the franchise agreement violates the federal antitrust laws.

■ For the same reasons we also disagree with defendant's contention that the tying arrangement violates the common law prohibition against restraint of trade. The primary question in determining if a contract violates the common law prohibition is whether the restraint is reasonable. If the restraint is unreasonable it is illegal as a bargain in restraint of trade. 2 Restatement of Contracts 987, § 514.

The test of reasonableness is set forth in 14 Williston on Contracts 84-85, § 1635, as follows:

"We do not see how a better test can be applied to the question whether reasonable or not, than by considering whether the restraint is such only to afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party, can be of no benefit to either, it can only be oppressive; and if oppressive, it is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void, on the grounds of public policy."

The record fails to show that the tying arrangement is unreasonable under the circumstances.

We have considered all of defendant's assignments of error and find them without merit.

Affirmed.